

# In the
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

---

No. 06-25-00084-CV

---

IN THE INTEREST OF A.C. AND E.C., JR., CHILDREN

---

On Appeal from the County Court at Law No. 2
Gregg County, Texas
Trial Court No. 2024-455-CCL2

---

Before Stevens, C.J., van Cleef and Rambin, JJ.
Memorandum Opinion by Justice Rambin

## MEMORANDUM OPINION

Mother and Father appeal the trial court's order terminating their parental rights to their children, Ashley and Edward,[1] who were fourteen and nine years old, respectively, when the Texas Department of Family and Protective Services removed them from the home. The trial court found that, with respect to both Mother and Father, the Department had proved four statutory grounds authorizing termination of their parental rights: ground D (endangering conditions or surroundings), ground E (endangering conduct), ground N (constructive abandonment), and ground O (use of controlled substance). *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(D), (E), (N), (O) (Supp.). The trial court also found that termination of Mother's and Father's parental rights was in the children's best interests. *See* TEX. FAM. CODE ANN. § 161.001(b)(2) (Supp.).

Mother challenges the legal and factual sufficiency of the evidence supporting the trial court's findings on grounds D, E, N, and O. Father does not challenge the trial court's findings on the statutory grounds. Mother and Father both challenge the legal and factual sufficiency of the evidence supporting the trial court's best-interest findings.

On accelerated review, we find that legally and factually sufficient evidence supports the trial court's termination of Mother's parental rights under grounds D and E and the trial court's best-interest findings as to both Mother and Father. We affirm the trial court's judgment terminating Mother's and Father's parental rights.

---

[1]We use pseudonyms to protect the identities of the children. *See* TEX. R. APP. P. 9.8(b), 9.8 cmt.

## I. Standard of Review and Applicable Law

"The natural right which exists between parents and their children is one of constitutional dimensions." *D.V. v. Tex. Dep't of Fam. & Protective Servs.*, 722 S.W.3d 854, 858 (Tex. 2025) (quoting *Wiley v. Spratlan*, 543 S.W.2d 349, 352 (Tex. 1976)). Parents have a "fundamental right[]," *Troxell v. Granville*, 530 U.S. 57, 65 (2000) (plurality op.) (quoting *Washington v. Glucksberg*, 521 U.S. 702, 720 (1997)), "to direct the upbringing of their children," *id.* Nonetheless, though "parental rights are of constitutional magnitude, they are not absolute. Just as it is imperative for courts to recognize the constitutional underpinnings of the parent-child relationship, it is also essential that emotional and physical interests of the child[ren] not be sacrificed merely to preserve that right." *In re C.H.*, 89 S.W.3d 17, 26 (Tex. 2002)).

"The State's fundamental interest in parental-rights termination cases is to protect the best interest of the child[ren]." *In re M.S.*, 115 S.W.3d 534, 548 (Tex. 2003). "The interests of the child[ren] and the State are typically expressed as being an inherent part of the analysis of the parent's rights." *In re C.C.*, 720 S.W.3d 41, 53 (Tex. App.—Texarkana 2025, no pet.) (citing *In re J.W.*, 645 S.W.3d 726, 753 (Tex. 2022) (Young, J., concurring) ("[T]he very sanctity of the parent-child relationship entails the need for an escape hatch if things go terribly wrong.")).

Due to the constitutional nature of the parties' interests, "the evidence in support of termination must be clear and convincing before a court may involuntarily terminate a parent's rights." *D.V.*, 722 S.W.3d at 858 (quoting *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985)); *see* citing TEX. FAM. CODE ANN. § 161.001(b) (Supp.). And due to the heightened burden of proof at

3

trial, "[p]arents also benefit from an otherwise-inapplicable elevated standard of appellate review." *Id.* (citing *In re N.G.*, 577 S.W.3d 230, 235 (Tex. 2019) (per curiam)).

On appellate review, we are tasked with "undertak[ing] 'an exacting review of the entire record with a healthy regard for the constitutional interests at stake.'" *In re A.B.*, 437 S.W.3d 498, 503 (Tex. 2014) (quoting *In re C.H.*, 89 S.W.3d at 26). "[T]he appellate standard for reviewing termination findings is whether the evidence is such that a factfinder could reasonably form a firm belief or conviction about the truth of the State's allegations." *In re C.H.*, 89 S.W.3d at 25. Both legal and factual sufficiency review deal with whether "a reasonable factfinder could form a firm belief or conviction," but there is a difference between legal and factual sufficiency. *In re A.C.*, 560 S.W.3d 624, 631 (Tex. 2018).

For legal sufficiency, the review is as follows:

> In a legal sufficiency review, a court should look at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true. To give appropriate deference to the factfinder's conclusions and the role of a court conducting a legal sufficiency review, looking at the evidence in the light most favorable to the judgment means that a reviewing court must assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so. A corollary to this requirement is that a court should disregard all evidence that a reasonable factfinder could have disbelieved or found to have been incredible. This does not mean that a court must disregard *all* evidence that does not support the finding. Disregarding undisputed facts that do not support the finding could skew the analysis of whether there is clear and convincing evidence.

> If, after conducting its legal sufficiency review of the record evidence, a court determines that no reasonable factfinder could form a firm belief or conviction that the matter that must be proven is true, then that court must conclude that the evidence is legally insufficient.

*In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002).

4

"The distinction between legal and factual sufficiency lies in the extent to which disputed evidence contrary to a finding may be considered." *In re A.C.*, 560 S.W.3d at 630. "In conducting a *legal*-sufficiency review, the reviewing court cannot ignore undisputed evidence contrary to the finding, but [it] must otherwise *assume the factfinder resolved disputed facts in favor of the finding*." *Id.* at 630–31 (emphasis added).

By comparison,

> [f]actual sufficiency . . . *requires weighing disputed evidence contrary to the finding* against all the evidence favoring the finding. In a factual-sufficiency review, the appellate court must consider whether disputed evidence is such that a reasonable factfinder could not have resolved it in favor of the finding. Evidence is factually insufficient if, in light of the entire record, the disputed evidence a reasonable factfinder could not have credited in favor of a finding is so significant that the factfinder could not have formed a firm belief or conviction that the finding was true.

*Id.* at 631 (emphasis added) (footnote omitted) (citation omitted). Under this approach, "[t]he assumption that the factfinder resolved disputed evidence in favor of the finding if a reasonable factfinder could do so remains." *In re Commitment of Stoddard*, 619 S.W.3d 665, 674 (Tex. 2020).

> However, rather than "disregard[ing]" disputed evidence that a reasonable factfinder could not have credited in favor of the finding, the court must determine whether, in light of the entire record, that evidence "is so significant that a factfinder could not reasonably have formed a firm belief or conviction" that the finding was true.

*Id.* (quoting *In re J.F.C.*, 96 S.W.3d at 266).

"This standard of appellate review announced in 2002 remains the law." *In re C.C.*, 720 S.W.3d at 54 (citing *In re R.R.A.*, 687 S.W.3d 269, 276 (Tex. 2024) (quoting *In re C.H.*, 89 S.W.3d at 25)).

5

"Reviewing courts . . . must defer to the factfinder's judgment as to the credibility of the witnesses and the weight to give their testimony, including reasonable and logical inferences from the evidence." *In re R.R.A.*, 687 S.W.3d at 279 n.50. "Such inferences must be reasonable and based on other facts proved." *Id.* "Our opinion does not render the clear-and-convincing-evidence standard toothless; instead, it properly defers credibility determinations to factfinders at the trial court level, who most closely interact with the witnesses." *Id.* at 279.

Generally, "[o]nly one predicate ground and a best interest finding are necessary for termination, so 'a court need uphold only one termination ground—in addition to upholding a challenged best interest finding—even if the trial court based the termination on more than one ground.'" *In re M.P.*, 639 S.W.3d 700, 702 (Tex. 2022) (per curiam) (quoting *In re N.G.*, 577 S.W.3d at 232). Grounds D and E deal with child endangerment. *In re R.R.A.*, 687 S.W.3d at 277. Termination on grounds D or E "has consequences for termination of parental rights as to children in a future proceeding." *In re Z.M.M.*, 577 S.W.3d 541, 542 (Tex. 2019) (per curiam); *see* TEX. FAM. CODE ANN. § 161.001(b)(1)(M). Therefore, "due process and due course of law require that the court of appeals review the legal and factual sufficiency of the evidence supporting a trial court's order of termination under Subsections 161.001(b)(1)(D) and (E) when challenged on appeal." *In re M.P.*, 639 S.W.3d at 704; *see In re J.W.*, 645 S.W.3d at 748 ("[W]e may not bypass [Mother's] evidentiary challenges to Subsections (D) and (E), the so-called endangerment grounds.").

Appellate review of termination on endangerment grounds must be conducted in a "holistic" fashion. *In re A.V.*, 697 S.W.3d 657, 659 (Tex. 2024) (per curiam) (orig. proceeding)

("reaffirm[ing] the holistic endangerment review set forth in [*In re*] *R.R.A.*"). The approach to endangerment review set forth in *In re R.R.A.* is not limited to drug use. *In re N.L.S.*, 715 S.W.3d 760, 764 (Tex. 2025) (per curiam) ("Father argues that [*In re*] *R.R.A.* is limited to drug-use cases. That is incorrect."). Consequently, we review endangerment findings considering the "aggregate weight" of factors supported by the evidence. *In re R.R.A.*, 687 S.W.3d at 281 (finding that termination on grounds D and E was supported by "the aggregate weight of Father's ongoing drug use, homelessness, employment instability, and near-complete abandonment of his children for the six months preceding trial").

"[A] nonexhaustive list of factors that should be considered when determining the best interest of a child" is found in *Holley v. Adams*, 544 S.W.2d 367 (Tex. 1976). *In re A.A.*, 670 S.W.3d 520, 534 n.57 (Tex. 2023). The listed factors are:

> (1) the desires of the child[ren]; (2) the emotional and physical needs of the child[ren] now and in the future; (3) the emotional and physical danger to the child[ren] now and in the future; (4) the parental abilities of the individuals seeking custody; (5) the programs available to assist these individuals; (6) their plans for the child[ren]; (7) the stability of the home or proposed placement; (8) the acts or omissions of the parent that may indicate that the existing parent-child relationship is not a proper one; and (9) any excuse for the acts or omissions of the parent.

*Id.* (citing *Holley*, 544 S.W.2d at 372 (footnotes omitted)).

"[T]he inquiry is whether, on the entire record, a factfinder could reasonably form a firm conviction or belief that termination of the parent's rights would be in the child[ren]'s best interest[s] . . . ." *In re C.H.*, 89 S.W.3d at 28.

In other words, the *Holley* factors are not a checklist:

> [W]e have never held that these considerations are exhaustive, or that *all* such considerations must be proved as a condition precedent to parental termination. The absence of evidence about some of these considerations would not preclude a factfinder from reasonably forming a strong conviction or belief that termination is in the child[ren]'s best interest, particularly if the evidence were undisputed that the parental relationship endangered the safety of the child[ren]. Other cases, however, will present more complex facts in which paltry evidence relevant to each consideration mentioned in *Holley* would not suffice to uphold the jury's finding that termination is required.

*Id.* at 27.

Consequently, the fact-finder may choose to give greater weight to one factor over others. *Id.* (upholding the trial court's finding that termination was in the children's best interests where five *Holley* factors were "lacking" in the view of the court of appeals, but there was "undisputed" evidence of the father's "historical deficiencies in parenting and current criminal proclivities").

## II.    The Evidence at Trial

Tammy Mott, an investigator with the Department, testified that Child Protective Services (CPS) received an intake regarding Ashley and Edward in February 2024 after an older sibling of the children, Steve, was arrested for aggravated assault. A report from the alleged incident indicated that Mother was not present, Mother was using drugs, and Ashley was earlier found at home alone with a strong odor of marihuana coming from the residence. Mott testified that Father was also not home and had minimal contact with the children since entering a drug rehabilitation facility in March 2023. Mott said the Department contacted Father, and he said he intended to get the children and send them to a grandparent's home in Alabama. Mott testified that while Father was absent, he expressed concerns about Mother's mental status and drug use,

8

that Edward was "missing a lot of school and no one show[ed] up on his behalf in truancy court," and that he had poor hygiene when he did attend.

Mott said Father was staying at the Truckerz Inn in Jacksonville, Texas. Mott visited Father and the children there and had no concern about the immediate health and safety of the children. Mott stated that the children were "healthy, happy, [and] fine. They weren't injured. Their needs were being met at the time."

Mott testified that on March 19, 2024, she was assigned to locate two children, fourteen-years-old and seventeen-years-old, who were in the Department's custody but had run away from their placements. Those children were alleged to be with Father and the children at the Truckerz Inn. Mott returned to the Truckerz Inn with her supervisor on March 20 to search the family's room for the seventeen-year-old. As Mott's supervisor started to look under the bed, Father got upset, and Mott and her supervisor left. Father remained in contact with Mott to help locate the seventeen-year-old, and on March 21, Father "facilitated a FaceTime phone call between [Mott] and the [seventeen]-year-old," and then, the recovery of the seventeen-year-old by the Department.

Mott further testified that she later accessed a hotel surveillance video recording that showed Father and the seventeen-year-old runaway. In the video recording, the child was taken into a restroom at the hotel by an unknown male. Father entered the restroom, then the three exited, with the child partially dressed and Father and the unknown male "toting [the child] down the hallway to another room." Mott testified that CPS attempted to interview Father about that, but Father was uncooperative.

9

Mott testified that based on her investigation, the runaways being found with the family, and the Department's concerns, the Department sought removal of Ashley and Edward from Mother and Father. An order granting the Department's emergency temporary managing conservatorship of Ashley and Edward was signed on March 25, 2024, and the Department was later granted temporary managing conservatorship.

Mott stated that Mother was not present during "all th[at] time" at the hotel or the removal, but Mother did appear at the hotel briefly while the family was there and "had to be criminally trespassed from that property." Mott testified that she received information that Mother was engaging in prostitution in the parking lot of the hotel.

Marie Zoungrana, a permanency specialist for 4Kids4Families, testified that Mother and Father were both ordered to complete a drug and alcohol assessment, psychological evaluation, counseling, parenting, and random drug testing. Zoungrana said Mother successfully completed only the psychological evaluation. She said that Mother's required counseling stemmed from the psychological evaluation, but Mother never followed up. Zoungrana testified that the only service Father did not complete was the parenting class. She testified that she did not set up the referral for the class until January and stated that she and Father had been trying to schedule but had not yet been able to get scheduled due to various conflicts.

Zoungrana testified that there were multiple times between the children's removal and Mother's incarceration (February 2025) when Mother was asked to take a drug test and she failed to comply. Zoungrana testified that between the time Mother was released from jail (May 2025) and the time of trial (September 2025), Mother complied with the requests to test, and

each time, the results were negative. Zoungrana testified that Father did not test twice when requested, and his test was positive for methamphetamine in November 2024.

Zoungrana testified that Mother had monthly in-person visits with the children from March of 2024 through July 2024, but then she stopped visiting. After Mother was released from jail, she had weekly virtual visits with the children. Zoungrana testified that Father had no visits with the children after they were removed.

Although Zoungrana admitted that Mother had a house in Gilmer, she testified that Mother did not have stable housing because she would not stay in contact or she would say "she was somewhere or she was not." Zoungrana also testified that Father had "been going from one rehab to another sober-living house" and thus had not demonstrated that he had "stable, reliable housing where kids can be returned to." Zoungrana acknowledged that Mother and Father were living in the same residence at the time of trial where Mother had been living in February 2024 when a shooting occurred during the alleged drug deal outside their residence. Zoungrana testified that she attempted to view the inside of the house on the Friday before trial, but Mother would not allow her entry. Zoungrana testified that Mother, Father, Mother's son Steve, and Steve's pregnant fiancée, the previous seventeen-year-old runaway, were living in the home at the time of trial.

Zoungrana testified that Ashley was in a residential treatment center (RTC) in Conroe, Texas, due to her behavior. Zoungrana said that all of Ashley's needs were being met there as far as her education, mental health requirements, medication, and being kept away from drugs and alcohol. Ashley had been in four separate placements during the proceeding—a shelter, a

11

psychiatric hospital, a foster home, and the RTC. Ashley had to go to the psychiatric hospital because she cut herself, said she would kill herself, and had a mental breakdown. After getting transferred to the RTC, Ashley was doing better—testing negative, attending school, attending substance-abuse counseling and anger management classes, and following the rules. Zoungrana testified that Ashley's visits with Mother had been going well, and Ashley wanted to maintain a relationship with Mother. Zoungrana said that Mother had provided gifts for both children. Zoungrana said that Ashley wanted to go back with her dad, but she was also content with being permanently placed with her aunt.

Edward was in a foster home in Cedar Hill, where he had been since May 2024. Zoungrana testified that Edward was doing well in his placement, and he was bonded to his foster family and they to him. She testified that before his foster placement, Edward was not doing well at all. Zoungrana said that Edward is quiet, but he had learned to express his feelings. He had been in school and was getting good grades. Edward told her he likes his foster placement. According to Zoungrana, the foster placement was interested in adopting Edward if that was an option.

At the time of trial, there was an outstanding home study on the children's paternal aunt in Katy, Texas. Zoungrana testified that the aunt did not initially respond to attempted contacts. When the Department did get in touch with the aunt, she backed out but later decided to be reconsidered. Zoungrana visited her home and found it to be a suitable home for the children. Zoungrana indicated that the aunt did not want conservatorship; rather, she wanted to adopt the children. Zoungrana said that if the home study on the aunt was approved, the Department's

12

plan was to move both children to her home together. If the home study was not approved, the Department planned to request direct placement and seek another family member who would be willing to be a placement. Zoungrana acknowledged that Edward's placement wanted to adopt him, and although the Department's goal is to "always to put [siblings] together," if it were unable to, it would place the children separately and give them "visitation or phone calls to maintain sibling contact."

Regarding the parents' plans to have the children eventually return to their home, Zoungrana testified that the Department was concerned about Mother's and Father's judgment in deciding they could have the children live in the same home with Steve, who had been involved in an alleged drug-related shooting, and his pregnant fiancée. The Department believed Mother and Father could have been making better decisions if they had completed their service plans. Zoungrana said that the Department was concerned about Mother's and Father's judgment in the children's educational matters because they both failed to have the children in school at the time of removal.

Zoungrana testified that it was the Department's position that Mother's and Father's parental rights should be terminated and the Department should be made permanent managing conservator. She testified that the children could not be safely reunified with Mother and Father and that it would not be in the children's best interests to name the parents as managing conservators.

13

Zoungrana acknowledged that Steve participated in some of Mother's virtual visits with the children and the children liked talking to him. She testified that if the children were placed with the aunt, visits with Mother and Father would be at the aunt's discretion.

Zoungrana acknowledged that the children wanted to maintain their relationships with Mother and Father. Nonetheless, she testified that it was in Ashley's best interests to have no contact with her parents "[b]ecause of what [she] has been through." Zoungrana also testified that it was in Edward's best interests to have no contact with Mother and Father.

Randi Davis, the court-appointed special advocate (CASA) supervisor, also testified that both children were doing much better at the time of trial than they were when they came into the Department's care. Davis testified that the children's current placements were meeting their needs. Davis testified that CASA did not want Mother and Father to be able to maintain decision-making ability, but it was not opposed to them having supervised contact. Davis opined that Mother and Father had not fixed the problems that led to poor judgment and caused removal. Davis testified that CASA believed that terminating Mother's and Father's parental rights and naming the Department permanent managing conservators of the children were in the best interests of the children. Davis testified that both children wanted to maintain contact with their parents.

Father testified that, at the time of trial, he lived in the family home in Gilmer, Texas, with his adult stepson, Steve, Steve's fiancée, and Mother. Father said that he was aware of Steve's arrest for aggravated assault in February 2024, but he was not present at the time of the

incident since he was at work and was then living at a sober-living facility. Father said that in February 2024, the children and Steve lived with Mother at the family home in Gilmer.

Father testified that he had struggled with alcohol and methamphetamine for many years. Father said that he started methamphetamine use when he was thirty-two years old, and he had been in drug rehabilitation facilities in 2003, 2004, for thirty or thirty-five days in March 2023, and for sixty days in 2024. Father testified that at the time of trial, he had not used methamphetamine since June 25, 2024, but he acknowledged that he tested positive for methamphetamine in November 2024.

Father said that he was living in a sober living facility and working when he had to take custody of Ashley and Edward in early 2024 after CPS called him. He went to get the children from Mother in Gilmer.

Father said that he knew Mother was using methamphetamine when he took custody of the children in early 2024, but he did not believe she had a history of drug abuse. Father did not know until the time of trial that Ashley had been found at home alone with a strong smell of marihuana coming from the home. Father testified that he had never seen Ashley use drugs and his children had never seen him use drugs.

Father agreed that he started residing with his children at the Truckerz Inn in Jacksonville in February 2024, where he stayed for about two months. Father testified that he traveled for his job, and Jacksonville was one of the towns where he worked. Father admitted that the children were not in school while they were at Truckerz Inn, but he was in the process of getting them enrolled.

15

Father identified the two runaway girls as friends of Ashley and said one of the girls is now his stepson's fiancée. Father said that he did not know they had run away from the Department. He said he did not attempt to contact their parents because the girls were with them all the time.

When asked about the video recording showing Father and another male going into a room with the seventeen-year-old runaway, Father said that the girl came to the hotel with the other male, who was her boyfriend. Father said that he got the male a room because he did not have identification. Father said that he did not know at the time that the runaway was seventeen-years-old, though he testified that he had known her for six or seven years at the time of trial. Father said that the male was a friend of his with whom he had done methamphetamine. Father testified that he did not know how his friend met the seventeen-year-old or how she knew him.

The male later called Father and said something was wrong with the girl. Father said he went to help her because she had taken something and she was "tripping out." Father went to the restroom beside the office, where the other two were, and he saw the girl "on the floor . . . flopping around." Father said that while they were taking her to the room he had rented for the male, the seventeen-year-old started removing her clothes. Father said he did not know what made her act that way. Father admitted he did not call the police, an ambulance, or CPS because he was actively using methamphetamine himself. He testified that after that incident, CPS asked Father about the runaway girls. CPS recovered the fourteen-year-old and Father assisted CPS with finding the seventeen-year-old. Father said that he found her "[a]t another drug place."

16

Father said that Mother came to visit at the Truckerz Inn one time during their stay. Father said that he and Mother "had a little falling out," the police were called, and Mother was "criminally trespassed" from the hotel. Father said that the children were in the room during their argument. Father stated that he did not know anything about Mother engaging in prostitution in the parking lot of the hotel, and he denied that there was ever an allegation of prostitution against Ashley.

Father said that he did not finish his service plan because "the caseworker has not got me the [parenting] class yet." Father testified that he had taken all drug and alcohol tests and had tested negative. Father testified that he had transportation, was working, and was living in the house in Gilmer with Mother, Steve, and Steve's seventeen-year-old fiancée.

Father testified that "[i]n a perfect world, [he would] want for [his] kids to be back with [him]. But as of right now, . . . it would be okay for them to go stay with [his] sister." Father requested that he be allowed to continue to be the children's parent and to have visitation with them.

Father testified that since he and Mother had gotten clean and remained drug-free for some time, they are calm and can talk. Mother is different, loving, and a good mother. Father said he believed Ashley, sixteen at the time of trial, and Edward, eleven at the time of trial, wanted to have a continued relationship with him and Mother. Father testified that he believed a continued relationship between him and the children would be in the children's best interests.

Mother testified that in February 2024, the alleged assault in which Steve was involved took place at their home, which she and Father had owned since 2014. Mother testified that she

heard gunshots outside, so she got the children and took them into the bathroom to protect them. Mother said Father took the children after the shooting happened. Mother testified that she was not using drugs at that time, and she denied knowing that Steve was "engaged in drugs" despite the fact that he had lived with her "[a]ll his life."

Mother testified that she visited the children once at the Truckerz Inn. She said that the children were being taken care of. Mother said that she and Father got into an argument in front of the children. The police "criminally trespassed" her from the property, and her mother came to pick her up. Mother was unaware that there was an allegation that she was engaging in sex acts for money in the parking lot of the hotel, which she denied.

Mother testified that she struggled with methamphetamine use when she was twelve-fourteen-years old, but she had not used "until this recent situation of losing [her] children." Mother testified that she was "pretty much" clean, only using once or twice, from the time she was eighteen, through her release from prison on a drug-related charge when she was nineteen or twenty, until "this situation." Mother said that she had never been in inpatient rehabilitation. Mother testified that her only methamphetamine use since February 2024 was on February 14, 2025. Mother testified that she used that day because she was told that since she could not make it to a drug test, she would no longer be able to see her children.

Mother testified that she was overwhelmed when she received the paperwork about the Department's suit due to an earlier traumatic brain injury. She said that she did not read the papers when she got them and she did not understand what was going on. Mother agreed that

18

she did not participate in her services between March 2024 and February 2025. Mother took responsibility for not working her services during that time.

Mother testified that she left the home after the children were removed and stayed at three or four separate places between February 2024 and the time of trial. Mother testified that she was incarcerated from February of 2025 to May of 2025 after her deferred adjudication was revoked due to missing a court date, and that was when she first met with her attorney. After that, Mother lived at a place in Arlington, Texas, where they "help[] people get back on their feet." Ashley was the victim on the injury-to-a-child charge for which Mother was incarcerated.

Mother testified that, at the time of trial, she was employed.

Mother testified that she had completed all of her services, including a psychiatric evaluation, parent education class, and random drug testing. Mother said she signed up for some additional services on her own, including a life skills class and an anger management class.

Mother admitted the children were not in school at the time of removal. She testified that Edward had a truancy issue due to missed school days during the 2023-2024 school year. Mother said that Ashley got kicked out of school for "aggressively [doing] something [at school]." Mother said that she wanted to homeschool the children at that point, but she had not gotten started with that.

Mother said she thought it would be best for the children to stay with their aunt while she remodeled and updated the home because since she had been gone, the home needed to be "put back together." Mother testified that even though Father had recently been in a questionable situation with the seventeen-year-old at the Truckerz Inn and Steve was involved in a drug-

19

related shooting at the home, it was a good idea to bring the children back into that home because everyone was clean and there was no drug or alcohol use. Mother testified that, "We are family. We have all changed." Mother testified that Steve was on "deferred probation" and was drug-free and stated that the children love their brother.

Mother testified that the children wanted to maintain a relationship with her and wanted to be together. She asked the trial court not to terminate her rights and to allow her to maintain a relationship with the children. Mother testified that she and Father were living together again, at the home in Gilmer, they both worked, and he had transportation. Mother testified that she believed it was in the children's best interests that Father's parental rights remain intact.

Mother testified that she had never seen Ashley use marihuana. Mother testified that she believes marihuana "is a healer" and can "help . . . people if it is used under the right circumstances." She said a minor child should not be consuming it.

The children's ad litem said that Edward was doing well in his placement and had expressed a desire to see Ashley and his family. Ashley did not like her placement at the RTC and did not like being away from her family. The ad litem stated that Ashley "would probably want to still have [her parents] as part of her life." He recommended limited supervised contact if the parental rights were intact and stated that it would not be in the children's best interests for them to be returned to their parents.

20

**III. Sufficient Evidence Supports the Department's Reasonable Efforts at Reunification**

Within her first issue, Mother argues that the Department did not prove that it met its requirement of making reasonable efforts to reunite her with her children by clear and convincing evidence.

The Texas Family Code provides that,

> In a suit for termination of the parent-child relationship filed by the Department of Family and Protective Services, the court may not order termination of the parent-child relationship under Subsection (b)(1) unless . . .
>
> > (1) the department made reasonable efforts to return the child[ren] to the parent before commencement of a trial on the merits and despite those reasonable efforts, a continuing danger remains in the home that prevents the return of the child[ren] to the parent.[2]

TEX. FAM. CODE ANN. § 161.001(f). Although Section 161.001(f) was enacted in 2023,[3] "[t]he phrase 'reasonable efforts to return the child[ren] to the parent' is not new[.] . . . [I]t appears in Section 161.001(b)(1)(N)." *In re M.N.M.*, 708 S.W.3d 321, 328 (Tex. App.—Eastland 2025, pets. denied) (quoting TEX. FAM. CODE ANN. § 161.001(b)(1)(N)). "As such, when addressing whether the Department proved by clear and convincing evidence that it made reasonable efforts to return [the children] to [their parents], we look to relevant judicial determinations regarding the Department's reunification efforts under Section 161.001(b)(1)(N)." *Id.*

"The Department's implementation of a family service plan is generally considered a reasonable effort to return the child[ren] to the parent," but "evidence of a service plan is not the exclusive means of establishing the Department's reasonable efforts to return the child[ren]." *Id.*

---

[2]Mother does not claim that the trial court did not make the findings required by Section 161.001(f), nor does she challenge the trial court's finding that a continuing danger prevented the return of the children.

[3]*See* Act of May 25, 2023, 88th Leg., R.S., ch. 675, §§ 1, 7, 2023 Tex. Gen. Laws 1644, 1644–45.

21

at 329; *see In re J.W.*, 615 S.W.3d 453, 463, 465 (Tex. App.—Texarkana 2020, no pet.). "Ultimately, 'the issue is whether the Department made reasonable efforts, not ideal efforts.'" *Id.* at 329 (quoting *In re J.A.*, No. 04-20-00242-CV, 2020 WL 5027663, at *2 (Tex. App.— San Antonio Aug. 26, 2020, no pet.) (mem. op.)). "The issue . . . is whether the Department's reunification efforts were reasonable under the circumstances." *Id.* However, "it is not enough to merely show presentment [of a service plan,] . . . the Department must also prove that 'the parent has been given a reasonable opportunity to comply with the terms of the plan.'" *In re J.W.*, 615 S.W.3d at 464. (quoting *In re A.Q.W.*, 395 S.W.3d 285, 289 (Tex. App.—San Antonio 2013, no pet.)

At trial, Zoungrana testified that the service plan was made a court order on May 2, 2024, and all referrals were set up for the court-ordered services. Zoungrana also testified that the Department facilitated visits with Mother, which she initially took advantage of, but Mother stopped visiting in July 2024 and did not resume visits again until she was released from jail. Zoungrana testified that the Department was working with the children's paternal grandparents to have the children placed with them, but the grandparents backed out in January 2025. The Department was also working with the children's paternal aunt and was planning to place the children with her if her home study was approved.

Zoungrana agreed that the Department's reasonable efforts to return the children included holding family group conferences, implementing the service plans, participating in review hearings, staying in contact with Mother and Father, helping Mother and Father participate in services, and attempting to visit their residence to assess its condition.

22

Mother claims that the Department did not prove that she was given a reasonable opportunity to comply with the service plan because there was no evidence that she was given options to complete services during the time she was in jail. The record establishes that Mother was appointed an attorney ad litem on March 25, 2024, and the service plan was made an order of the trial court on May 2, 2024. Mother was jailed from February 2025 through May 2025. Further, the matter was retained on the trial court's docket past the twelve-month deadline with an extended dismissal date of September 19, 2025, and the matter went to trial on September 18, 2025.

Mother testified that she received the documents around the time of the removal of the children, but she did not read them all. Mother admitted she had a court-appointed attorney and a case worker during the whole case. Mother further agreed that the caseworker made efforts to get her started on her services from March 2024 until February 2025, when Mother was incarcerated. Mother admitted that other than the three months she was incarcerated, she was able to work on her services. Mother testified that she did not participate in her services until she got out of jail in May 2025, even though she understood that the services were for the purpose of helping her to get her children back.

After an exacting review of the entire record, and considering the particular circumstances presented here, we find that the trial court could reasonably have formed a firm belief or conviction that the evidence supported its reasonable efforts finding. After viewing all the evidence in the light most favorable to the reasonable efforts finding, we conclude that the trial court could have formed a firm belief or conviction that the Department met its burden of

proving that it made reasonable efforts to return the children to Mother. *See In re M.N.M.*, 708 S.W.3d at 332; *In re Z.N.*, 602 S.W.3d 541, 545 (Tex. 2020) (per curiam). After performing an exacting review of the entire record, we determine that the record is factually sufficient to support the trial court's reasonable efforts finding. *See In re M.N.M.*, 708 S.W.3d at 332; *In re A.B.*, 437 S.W.3d at 500.

## IV. Sufficient Evidence Supports the Ground D and Ground E Findings against Mother

In her first issue, Mother claims that the evidence was legally and factually insufficient to support termination of her parental rights under grounds (D), (E), (N), or (O). Because we must, we first examine grounds (D) and (E). *See In re M.P.*, 639 S.W.3d at 704; *In re J.W.*, 645 S.W.3d at 748.

Ground D permits termination of parental rights "if the court finds by clear and convincing evidence . . . that the parent has . . . knowingly placed or knowingly allowed the child[ren] to remain in conditions or surroundings which endanger the physical or emotional well-being of the child[ren]." TEX. FAM. CODE ANN. § 161.001(b)(1)(D). "[T]ermination under (D) requires that the child[ren]'s environment is a source of endangerment, and the parent's conduct may create that dangerous environment." *In re C.E.*, 687 S.W.3d 304, 310 (Tex. 2024) (per curiam). "A child is endangered when the environment creates a potential for danger that the parent is aware of, but disregards." *In re L.E.S.*, 471 S.W.3d 915, 925 (Tex. App.—Texarkana 2015, no pet.) (quoting *In re N.B.*, No. 06-12-00007-CV, 2012 WL 1605457, at *9 (Tex. App.—Texarkana May 8, 2012, no pet.) (mem. op.)). "[T]he courts of appeals have held that the relevant time frame for evaluating this ground is before the child's removal 'since

24

conditions or surroundings cannot endanger a child unless that child is exposed to them.'" *In re J.W.*, 645 S.W.3d at 749 (quoting *In re O.R.F.*, 417 S.W.3d 24, 37 (Tex. App.—Texarkana 2013, pet. denied)).

"Ground '(D) permits termination [of parental rights] based on a single act or omission [by the parent].'" *In re D.R.*, 631 S.W.3d 826, 833 (Tex. App.—Texarkana 2021, no pet.) (alterations in original) (quoting *In re L.C.*, 145 S.W.3d 790, 797 (Tex. App.—Texarkana 2004, no pet.)). "[U]nlawful conduct by persons who live in the child's home . . . is a part of the 'conditions or surroundings' of the child's home under section 161.001(1)(D)." *In re C.S.L.E.H.*, No. 02-10-00475-CV, 2011 WL 3795226, at *4 (Tex. App.—Fort Worth Aug. 25, 2011, no pet.) (mem. op.); *see In re B.R.*, 822 S.W.2d 103, 106 (Tex. App.—Tyler 1991, writ denied). "[I]llegal drug use by a parent likewise supports the conclusion that the children's surroundings endanger their physical or emotional well-being." *In re L.E.S.*, 471 S.W.3d at 925.

Ground E permits termination of parental rights "if the court finds by clear and convincing evidence . . . that the parent has . . . engaged in conduct or knowingly placed the child[ren] with persons who engaged in conduct which endangers the physical or emotional well-being of the child[ren]." TEX. FAM. CODE ANN. § 161.001(b)(1)(E). Ground E examines endangering conduct by the parent or others. *Id.* "[T]ermination under (E) requires that a parent's conduct endanger the child[ren]'s physical or emotional well-being." *In re C.E.*, 687 S.W.3d at 310. "The endangering conduct may also occur 'either before or after the child[ren]'s removal by the Department.'" *In re Y.B.*, No. 06-25-00049-CV, 2025 WL 2885861, at *4 (Tex.

25

App.—Texarkana Oct. 10, 2025, no pet.) (mem. op.) (quoting *In re R.G.*, No. 06-24-00035-CV, 2024 WL 4142842, at \*5 (Tex. App.—Texarkana Sept. 11, 2024, no pet.) (mem. op.)).

As used in the parental-rights termination statutes, "'endanger' means to expose to loss or injury; to jeopardize." *Tex. Dep't of Hum. Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987). "Although "'endanger" means more than a threat of metaphysical injury or the possible ill effects of a less-than-ideal family environment,' it does not require that there be conduct 'directed at the child[ren]' or that 'the child[ren] actually suffer[] injury.'" *In re J.W.*, 645 S.W.3d at 748 (third alteration in original) (quoting *Boyd*, 727 S.W.2d at 533).

"[A] parent's use of narcotics and its effect on his or her ability to parent may qualify as an endangering course of conduct." *In re J.O.A.*, 283 S.W.3d 336, 345 (Tex. 2009). "A fact-finder can reasonably infer that a parent is using drugs from that parent's refusal to submit to drug tests." *In re C.C.*, 720 S.W.3d at 64 n.28 (citing *In re W.E.C.*, 110 S.W.3d 231, 239 (Tex. App.—Fort Worth 2003, no pet.); *In re A.V.*, 697 S.W.3d at 659 ("termination supported by factors including continued drug use despite the pendency of termination proceedings")).

"[I]ntentional criminal activity which expos[es] the parent to incarceration is relevant evidence tending to establish a course of conduct endangering the emotional and physical well-being of the child[ren]." *In re A.W.T.*, 61 S.W.3d 87, 89 (Tex. App.—Amarillo 2001, no pet.) (per curiam); *A.H. v. Tex. Dept of Fam. & Protective Servs.*, No. 03-11-00556-CV, 2012 WL 1813051, at \*8 (Tex. App.—Austin May 18, 2012, no pet.) (mem. op.). "[W]hen all of the evidence, including imprisonment, shows a course of conduct that has the effect of endangering the physical or emotional well-being of [the] child[ren], a finding under section 161.001(1)(E) is

26

supportable." *Walker v. Tex. Dep't of Fam. & Protective Servs.*, 312 S.W.3d 608, 617 (Tex. App.—Houston [1st Dist.] 2009, pet. denied).

A failure to have children educated may show a course of conduct that endangers the physical or emotional well-being of the children. *In re C.C.*, 720 S.W.3d at 64 (citing *T.D. v. Tex. Dep't of Fam. & Protective Servs.*, 683 S.W.3d 901, 914 (Tex. App.—Austin 2024, no pet.).

"In our analysis under Ground E, we may also consider a parent's failure to complete relevant requirements of a family service plan." *In re Y.B.*, 2025 WL 2885861, at *4.

The evidence at trial established that in February 2024, Mother had custody of the children, and Father was not in the home and had not been for about a year. In late January, Steve, the children's older brother, was arrested on assault charges after a shooting incident related to a drug deal at the home. Mother denied knowing Steve was involved with drugs but admitted that Steve had lived with her all his life. Mother also denied that she was using drugs at that time, but later admitted to using in February 2024, and Father expressed a concern that she was using. Mott received information that Mother had been absent from the home. Mother admitted to having a problem with methamphetamine when she was younger, and she did not complete requested drug testing early in the case. Mother admitted to relapsing during the pendency of the case. There was also an indication that Ashley may have been using marihuana in the home.

No one was ensuring that the children were in school or otherwise receiving an education. No one appeared on Edward's behalf at a truancy hearing.

27

When the Department did its initial investigation, it did not remove the children from Mother because Father was available to take them. Mother denied knowing that Father was using drugs at that time. Although Mother admitted to only one visit to see the family during the time they were living at the Truckerz Inn, during that visit Mother and Father engaged in an argument serious enough that the police were called. Further, Mother was "criminally trespassed" from the property and was alleged to have been engaged in prostitution in the parking lot. Mother admitted she was "criminally trespassed" but denied the prostitution allegation.

Mother was incarcerated during the pendency of the case because she missed a court date during her deferred adjudication for injury to a child—her daughter, Ashley.

Mother did not work her services at the beginning of the case but did much better after connecting with her attorney while she was in jail. She tested clean for the remainder of the proceeding. She enrolled in life skills and anger management classes. Nonetheless, Zoungrana testified that Mother did not complete her service plan because she failed to complete a drug and alcohol assessment, counseling recommended by the psychologist, and parenting classes.

> We are mindful that
>
> witness credibility issues "that depend on appearance and demeanor cannot be weighed by the appellate court; the witnesses are not present. And even when credibility issues are reflected in the written transcript, the appellate court must defer to the [fact-finder's] determinations, at least so long as those determinations are not themselves unreasonable."

*In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005) (per curiam) (quoting *Sw. Bell Tel. Co. v. Garza*, 164 S.W.3d 607, 625 (Tex. 2004)); *see In re J.F.*, No. 06-15-00033-CV, 2015 WL 7293322, at

*9 (Tex. App.—Texarkana Nov. 19, 2015, no. pet.) (mem. op.); *In re R.R.A.*, 687 S.W.3d at 279 n.50.

After an exacting review of the entire record, we find that the trial court could reasonably have formed a firm belief or conviction that the evidence supported its grounds D and E findings under the legal, factual, and holistic review principles set forth above. After viewing all of the evidence in the light most favorable to grounds D and E findings, we conclude that the trial court could have formed a firm belief or conviction that the Department met its burden for terminating Mother's parental rights under statutory grounds D and E. *See In re Z.N.*, 602 S.W.3d at 545. After performing an exacting review of the entire record, we determine that the record is factually sufficient to support the trial court's findings. *See In re A.B.*, 437 S.W.3d at 500.

Because we conclude that the evidence is legally and factually sufficient to support grounds D and E, we do not address Mother's arguments that the evidence is legally and factually insufficient to support the trial court's findings on the remaining grounds. *See In re M.P.*, 639 S.W.3d at 702.

We overrule Mother's first issue.

## V.    Findings Regarding Best Interests

Mother and Father both challenge the sufficiency of the evidence to support the trial court's best-interests findings—Mother by her second issue and Father by two separate issues—challenging the legal and factual sufficiency of the evidence, respectively. We examine the evidence supporting the *Holley* factors for support of the trial court's best-interests findings.

29

Even when the evidence supports termination on endangerment grounds, the outcome of the best-interests inquiry is not a foregone conclusion. *See In re R.R.A.*, 687 S.W.3d at 281. There, the court upheld termination on endangerment grounds, but then held, "Whether Father's bond with the children warrants further work toward reunification is most appropriately addressed in a best-interest determination . . . ." *Id.* However, though proof of statutory termination grounds "does not relieve the petitioner from proving the best interest of the child[ren], the same evidence may be probative of both issues." *In re C.H.*, 89 S.W.3d at 28; *see In re J.W.*, 645 S.W.3d at 747–48.

The first *Holley* factor requires that "the desires of the child[ren]" be taken into consideration. *Holley*, 544 S.W.2d at 372. Zoungrana, Davis, and Father all testified that both children want to maintain their relationships with Mother and Father, and Mother testified that both children want to maintain a relationship with her and that they want to be together. The children's ad litem represented that Ashley did not like being away from her family and Edward had expressed a desire to see Ashley and his family. He said that Ashley still wanted her parents to be a part of her life. We find that this factor does not support the trial court's best-interests finding.

The second and third *Holley* factors center around "the emotional and physical needs of the child[ren]" and "the emotional and physical danger to the child[ren]" both "now and in the future." *Id.* In this analysis, the trial court could consider the evidence regarding grounds D and E set forth above. That evidence establishes that Mother was not meeting the emotional and physical needs of the children at the time Father took custody of them, and she made little

30

progress towards meeting those needs until over a year after they were removed. Although Father provided a place for the children to stay and thus delayed removal, he admitted to using methamphetamine while the children were in his custody, and he did not enroll them in school. There were allegations that prostitution was taking place at the hotel and that Ashley was a part of that.

There was evidence that Father was working at the inception of the case and continued to work. He testified that he could provide financial support for the children. Mother, though she did not have a job when the children were removed, had gotten a job by the time of trial. Towards the end of the case, after having no contact with the children for approximately ten months, Mother began having virtual visits with them. No visitation was ordered for Father from the beginning of the case, and our record does not indicate that he ever sought to change that determination. Had their parental rights been intact, after a period of home renovations, Mother planned to welcome the children back into the home with Steve, their brother who had been involved in a drug-related shooting at their home with them present. At least initially, Father wanted the children to be placed with his sister, who wanted to adopt the children.

Mother maintained sobriety after she was released from jail, and Father had only one positive drug test in November 2024. There was also evidence that both parents had years-long struggles with remaining drug-free.

Zoungrana and Davis both testified that the children were doing much better at the time of trial than they were when they came into the Department's care. Zoungrana testified that the children's physical needs were being met in their current placements. She said that Edward was

31

bonded to his foster family and they to him. Zoungrana and Davis opined that the parents were not exercising good judgment in making decisions about the children's future, particularly regarding placing them back in the family home and making educational decisions. Zoungrana stated that it would not be safe to reunite them. Taking into account all the evidence cited above with respect to the second and third *Holley* factors, the record supports the trial court's determination as to best interests.

The fourth *Holley* factor regards "the parental abilit[y] of the [person] seeking custody," *id.*, and "we [may] consider [the parents'] past ability to care for [the] children as an indicator of future actions," *In re B.B.*, No. 06-24-00047-CV, 2024 WL 4448690, at *6 (Tex. App.—Texarkana Oct. 9, 2024, no pet.) (mem. op.). As noted above, while the children were in Mother's custody, neither was regularly attending school. When Father took custody of the children, he did not enroll them in school. There was conflicting testimony on whether Mother completed her parenting class, though Mother enrolled herself in life skills and anger management classes. Father did not complete his parenting class, though Zoungrana admitted that she had been unable to get him scheduled. At the end of the case, both parents were employed, and they owned a home. Father had transportation. Both parents had a history of drug abuse, there was evidence both used while they had custody of the children, and both continued to use at least once after the children had been removed, though both tested clean for several months leading up to the final hearing. The evidence of this fourth *Holley* factor supports the trial court's determination regarding the children's best interests.

The fifth *Holley* factor examines the "programs available to assist" persons seeking custody. *Holley*, 544 S.W.2d at 372. On appeal, Mother claims that she participated in a sober-living situation, counseling, and drug and alcohol abuse assessment, and parenting education, but Mother testified that the housing in Arlington was not "labeled 'sober living'" and Zoungrana testified that Mother did not do counseling, the drug and alcohol abuse assessment, or parent education. Mother testified that she signed up for anger management and life skills classes on her own, but she did not do that until almost a year into the proceedings. Father completed the services assigned to him, with the exception of parenting classes. The evidence of this fifth *Holley* factor does not support the trial court's determination regarding the children's best interests as to termination of Father's parental rights, but it does support the trial court's determination regarding the children's best interests as to Mother's.

The sixth *Holley* factor examines the plans the persons seeking custody have for the children. *Id.* At the time of trial, Mother and Father were back in the home with Steve. Mother planned to have the children back there with her after she remodeled, but Father said his sister would provide a suitable home for them, at least in the short term. Zoungrana testified, however, that the paternal aunt was only interested in adoption, not conservatorship. The Department planned to place the children with the aunt if the home study was approved, and, if not, to look for another relative placement.

Both parents seemed to plan that the children would be back in their home in the long term. Considering the testimony that the aunt was only interested in adoption, the trial court could have determined that the children's best interests would be better served by terminating

33

Mother's and Father's parental rights so that the children could achieve some degree of stability and permanency were they able to be permanently placed with her, another family member, or, in Edward's case, his foster family. The evidence regarding this sixth factor supports the trial court's determination.

The evidence of the seventh *Holley* factor—"stability of the home or proposed placement"—has been analyzed in part above. *Id.* While there was testimony that Mother and Father had owned their home for over ten years, Father had not been living there for approximately a year prior to the Department's involvement. There was testimony that Mother was absent at that time. After Father took the children to live with him at the Truckerz Inn, Mother lived in various places and was incarcerated for three months before moving back to the family home before the trial.

Considering Ashley's age and expressed desire to not remain at the RTC, it could not be considered a stable long-term placement for her. Edward, on the other hand, was placed with a foster family interested in adopting him. Whether the children could be placed with the paternal aunt or any other family member was still speculative at the time of trial. While Mother and Father both indicated that their home would be suitable for the children after some initial placement with the aunt, it is not reasonable to assume that long-term stability would be achieved there, as Mother and Father would both have to remain drug-free and in the home, and Steve would have to be law-abiding. The evidence on this point supports the trial court's best interest finding as to Edward but is neutral as to the best interest finding as to Ashley.

The eighth *Holley* factor examines whether the "existing parent-child relationship [was] . . . a proper one." *Id.* There were allegations that Mother and Father were both using drugs while they had custody of the children shortly prior to removal, and Father admitted that to be the case. Additionally, Father was involved in questionable sexual activities involving the seventeen-year-old runaway at the hotel, and Mother and Father fought in front of the children at the hotel to a level that required the police to be called. It is also significant that while Mother increased her visits with the children after her incarceration, Father seemingly never sought to change the no-visitation status assigned him at the inception of the case. The evidence of this factor supports the trial court's best-interests determination.

Finally, the ninth *Holley* factor includes a consideration of whether there is an excuse for Mother's and Father's acts or omissions. *See id.* Mother testified that she stopped visiting with the children because the caseworker told her she could no longer see the children after Mother told the caseworker she did not have transportation in order for her to take a random drug test. Mother said that the caseworker told her, "You can no longer see your children." But Zoungrana testified that that was not true—she merely told Mother that her failure to comply with requested drug testing could affect her visitation. Moreover, Mother stopped visiting in July 2024, yet she testified that she relapsed in February 2025, right after being told she could no longer see the children.

Mother also claimed her cognitive limitations from her traumatic brain injury caused her to misunderstand paperwork in a manner that prevented her from beginning services. Yet, Mother admitted that she had appointed counsel from the inception of the case, she did not

35

complain about the effectiveness of that counsel, and she accepted responsibility for failing to begin services until she was incarcerated, at least eleven months after the children were removed. "A parent's lack of education, training, or misfortune is considered when reviewing excuses for acts or omissions of a parent; however, these considerations do not negate evidence tending to show that termination is in the child[ren]'s best interest." *Jordan v. Dossey*, 325 S.W.3d 700, 732 (Tex. App.—Houston [1st Dist.] 2010, pet. denied); *see In re X.R.L.*, 461 S.W.3d 633, 640 (Tex. App.—Texarkana 2015, no pet.). This final factor supports the trial court's best-interests determination.

Having discussed the *Holley* factors in order, we conclude by noting that not all factors must be present. *In re C.H.*, 89 S.W.3d at 27.

After an exacting review of the entire record with a healthy regard for the constitutional interests at stake, we find that the trial court could reasonably have formed a firm belief or conviction that termination of Mother's and Father's parental rights was in Ashley's and Edward's best interests under the legal and factual review principles set forth above. *See In re J.F.C.*, 96 S.W.3d at 266. Regarding factual sufficiency, the disputed evidence contrary to the best-interests finding is not so significant that the trial court could not reasonably have formed a firm belief or conviction that termination of Mother's and Father's parental rights was in Ashley's and Edward's best interests. *See id.* at 266–67. Therefore, we hold the evidence is legally and factually sufficient to support the trial court's best-interest finding. *See* TEX. FAM. CODE ANN. § 161.001(b)(2).

We overrule Mother's second issue and Father's first and second issues.

36

## VI.    Conclusion

We affirm the trial court's order terminating Mother's and Father's parental rights.


Jeff Rambin
Justice

Date Submitted:    February 3, 2026
Date Decided:    March 31, 2026